IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 19, 2024 Session

**STATE OF TENNESSEE v. ROYCE SCOTT EARLEY**

**Appeal from the Circuit Court for Anderson County**
**No. C0C00066      Ryan M. Spitzer, Judge**

_____

**No. E2023-01534-CCA-R3-CD**

_____

The Defendant, Royce Scott Earley, confessed to multiple acts of rape against his eight-year-old daughter, and a jury subsequently convicted him of two counts of rape of a child (counts one and three), two counts of incest (counts two and four), and one count of aggravated sexual battery (count five), for which he received an effective sentence of 104 years in confinement.  On appeal, the Defendant raises three issues for our review: (1) whether the trial court erred in denying his motion to suppress his confession because it was not voluntary; (2) whether the State introduced sufficient evidence to corroborate his confession for counts three through five under the modified trustworthiness standard outlined in State v. Bishop, 431 S.W.3d 22 (Tenn. 2014); and (3) whether the trial court imposed an excessive sentence.[1]  After review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and TOM GREENHOLTZ, JJ., joined.

Tracey Vought Williams, Wartburg, Tennessee (on appeal); Ann Coria, District Public Defender; E. Kendall White, Nashville, Tennessee (at trial), for the appellant, Royce Scott Earley.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Dave Clark, District Attorney General; and Emily F. Abbot and Sarah Keith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

---

[1] We have reframed the Defendant's issues for clarity.

The victim's mother (hereinafter "Mother"), who was also the Defendant's live-in girlfriend, came home from work early on December 15, 2019, walked into her bedroom, and observed the naked Defendant forcing the eight-year-old, partially clothed victim to engage in fellatio. Mother grabbed the victim, called 911, and took the victim to East Tennessee Children's Hospital ("ETCH") for a forensic medical examination. Law enforcement subsequently detained the Defendant and brought him to the Anderson County Sheriff's Office ("ACSO"). After being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), the Defendant acknowledged his understanding by signing a written waiver. During his confession, he admitted to the rape of the victim that day (counts one and two) and to the rape of the victim two additional unspecified times within the past month. On March 3, 2020, an Anderson County grand jury indicted the Defendant on six counts: three counts of rape of a child, a Class A felony, in violation of Tenn. Code Ann. § 39-13-522, and three counts of incest, a Class C felony, in violation of Tenn. Code Ann. § 39-15-302. The Defendant does not contest the December 15, 2019 rape and incest, which form the basis of counts one and two, and his challenge in this appeal is confined to the remaining counts.

**Facts and Procedural History.** Before trial, the Defendant filed three motions to suppress his confession, and the trial court held two pretrial suppression hearings. In his first motion to suppress, the Defendant argued that his confession was the "fruit of the poisonous tree" because it was based on the unverified statements of Mother and that his statement was involuntary because law enforcement knew he was suicidal and failed to take him for a psychiatric evaluation before questioning. In response, the State argued there was probable cause to support the Defendant's detention and arrest and that his confession was voluntary. In the Defendant's second and third motions to suppress, he again argued his confession was the fruit of the poisonous tree because Mother was not a reliable informant. The State responded by reiterating its previous arguments.

At the first suppression hearing, ACSO 911 Dispatcher Karen Foust testified that her job was to take 911 calls and to determine the nature and location of the reported incident. She explained that dispatchers typed information from each call into a Computer Aided Dispatch ("CAD") card. Foust confirmed she was the dispatcher who received Mother's call. Defense counsel objected to the admission of the 911 calls, arguing they were not relevant because the officer who detained the Defendant did not hear them. The State argued the recordings contained the original complaint that led to the seizure the Defendant alleged was unlawful. The trial court overruled the objection. In the recording of Mother's first 911 call, an audibly distraught Mother said she "just got off work and [the Defendant] was raping [her] daughter." Foust asked for Mother's address multiple times but received no response. In the recording of the second 911 call, Mother, still distraught, told Foust her cell phone had died during the previous call and that the victim was eight years old. Mother said, "I came home, and [the Defendant] was making [the victim] . . .

- 2 -

give him a blow job." Foust asked for the Defendant's location, and Mother said he fled in a blue Nissan truck, but she "didn't know where he went." Mother confirmed she was still with the victim and said she did not think the victim needed an ambulance.

On cross-examination, Foust confirmed her name was on the CAD printout in the "[c]all taken by" field, which meant she was "responsible for putting [the call information] into the system that passed to the [responding] officer[.]" In one entry, Foust wrote, "[Mother] advised Deputy Presson, and [the Defendant] has contacted her. He is intoxicated . . . [and] told her he is going to end it all." Foust admitted she should have informed officers that the Defendant was suicidal by ACSO protocol, but she did not. The trial court entered the CAD printout and 911 recordings into evidence.

ACSO Deputy Sheriff Mark Whaley testified that he detained the Defendant before his confession. Deputy Whaley had received a call alleging the Defendant abused the victim and had fled in a pickup truck. Deputy Whaley located the Defendant's pickup truck, parked near a boat landing. While waiting for backup officers, Deputy Whaley ran the vehicle's tags and confirmed the vehicle belonged to the Defendant. When backup officers arrived, Deputy Whaley exited his patrol car and spoke with the Defendant. After confirming the Defendant's identity, Deputy Whaley told the Defendant to exit his vehicle. The Defendant complied and was briefly detained by Deputy Whaley before being transported to the station to be interviewed by Detective Slater. Deputy Whaley testified that the Defendant was "calm," "complacent," and did not do anything to make Deputy Whaley fear for his safety. The Defendant did not tell Deputy Whaley that he wanted to kill himself. Deputy Whaley did not question the Defendant due to the severity of the allegations. Deputy Whaley also stated the Defendant was handcuffed in the back of the patrol car per ACSO policy and could not have acted on any suicidal thoughts.

On cross-examination, Deputy Whaley testified he did not recall receiving the CAD, which reported that the Defendant told Mother he was suicidal. His patrol car was not equipped with a camera, and he was unsure if the backup patrol car had one. The Defendant showed his driver's license when Deputy Whaley approached his vehicle, and Deputy Whaley patted the Defendant down to check for weapons. He agreed there was no reason to believe the Defendant was armed. Deputy Whaley confirmed he detained the Defendant and brought him to the station for questioning. Deputy Whaley testified that neither he nor the backup officer Mirandized the Defendant. Deputy Whaley admitted he could have contacted a mobile crisis unit if he suspected the Defendant was suicidal. However, he did not have the medical experience or psychological training to make that determination.

ACSO Detective Darrell Slater, retired at the time of the hearing, testified that he had worked in law enforcement for twenty-seven years and specialized in child sex abuse cases for twelve years. On the day of the offense, he advised Mother to take the victim to

- 3 -

ETCH for an evaluation. Because Mother reported the Defendant was suicidal, Detective Slater had the Defendant transported to the station for questioning. Although the Defendant was brought to the station in handcuffs, he was not under arrest. The Defendant's handcuffs were removed at the station, and he was advised of his Miranda rights. The Defendant signed a form indicating that he waived his rights. However, at the end of the interview, the Defendant said he did not feel he could provide a written statement. The trial court entered the waiver form into evidence without objection.

Detective Slater began interviewing the Defendant two hours after the 911 call by Mother. Although the Defendant was "a little withdrawn," he did not appear "emotionally upset" or intoxicated. The State sought to play the audio recording of the Defendant's confession, but defense counsel objected, arguing it was not relevant to the unlawful seizure issue. The State argued the recording was relevant to the Defendant's assertion that under Tennessee Code Annotated section 33-6-401 law enforcement had a statutory duty to take him to a psychiatric evaluation before the interview because he was suicidal. The State reasoned that the recording depicted the Defendant's condition and demeanor, which was inconsistent with being intoxicated or suicidal. The trial court agreed, overruled the objection, and admitted the recording into evidence.

In the recording, Detective Slater asked the Defendant if he had prior dealings with law enforcement. The Defendant said he had once been detained by police in Knox County for public intoxication. Detective Slater told the Defendant, "I want to try and help you as much as I can . . . I still have a little bit of influence right now[.]" He then advised the Defendant of his Miranda rights, and the Defendant signed a form indicating he waived his rights. The Defendant discussed his alcoholism, admitted he did things he knew were wrong when he was drunk, and stated that he recently joined Alcoholics Anonymous ("AA"). Detective Slater asked the Defendant if he had considered joining other twelve-step groups. The Defendant said he had considered joining "Sexaholics Anonymous" but struggled to find meetings to attend. Detective Slater informed him about support groups for pedophiles, such as Minor Attracted People ("MAPS") and Non-Offending Minor Attracted People ("NOMAPS"). Detective Slater also said, "I'm not ever gonna [sic] judge you, brother," because pedophilia is "not something that you can help."

The Defendant identified the victim as his daughter and confirmed that he and Mother had lived together since May 2017. Detective Slater asked the Defendant when he first felt sexually attracted to the victim, and the Defendant responded, "I don't know if it was attraction or if it was the fact that she was at the house." The Defendant admitted his first sexual encounter with the victim, which involved fellatio and cunnilingus, occurred "a little over a month ago." He insisted "the only thing that happened [during the first encounter] was oral," and he did not rape the victim vaginally. However, he conceded that

- 4 -

one of his encounters with the victim involved anal contact. The Defendant said, "I'm honestly trying to remember, but I know that anal is as far as it's ever gone."

Detective Slater asked, "[H]ow many times would you say this has happened [in the past month]?" and the Defendant responded, "Today would be the third." The Defendant said the encounters involved "mostly oral" sex. Detective Slater told the Defendant that Mother took the victim to ETCH. When asked if he had abused any other children, the Defendant responded, "No, generally it's just porn. Internet porn." The Defendant clarified that he only watched "adult porn," not child sex abuse images. The Defendant admitted "contacting escorts," and Detective Slater assured him that "[t]here ain't nothing [sic] wrong with that." The Defendant confirmed he and Mother were 42 and 32 years old, respectively. The Defendant also said he did not know if he could provide a written statement. The Defendant lamented, "I wish I had [an AA] sponsor call earlier today. That's just my own fault." Detective Slater told the Defendant his goal was to prevent this from happening again, and he assured the Defendant that "this is fixable." The recording ends with Detective Slater saying, "I appreciate your cooperation. I can guarantee that it will help you in the long run."

Detective Slater testified he did not do anything the Defendant might have considered intimidating, nor was there anything to indicate the Defendant's participation was involuntary. Detective Slater testified the Defendant was "sort of emotionless . . . [and] kind of monotone," but he "did cry a little bit towards the end." Detective Slater did not remember the Defendant expressing "any kind of anger or [aggression]," and he did not appear intoxicated or suicidal. Although Detective Slater usually waited for a grand jury indictment before arresting a suspect, he arrested the Defendant immediately after the interview because the Defendant "still had the potential of going back home to the victim." Sometime after the Defendant's arrest, Detective Slater "met with him in jail and asked for a DNA sample," but he did not ask any other questions.

On cross-examination, Detective Slater testified that the Defendant told him he had been Mirandized when he was initially detained and that he was the second person to advise the Defendant of his rights. Before the interview, Detective Slater knew that Mother had reported that the Defendant was suicidal. He agreed that he had "zero evidence" that Mother's statements were reliable because she had no prior "informant" history. Detective Slater did not instruct Deputy Whaley to take the Defendant to a mental health facility before questioning.

Detective Slater agreed he had nothing to compare the Defendant's mental state to because he had not previously met the Defendant. When Detective Slater was asked if he had asked the Defendant if he was suicidal, Detective Slater replied, "In a – way." He explained that he asked the Defendant if he needed any help and talked with the Defendant

about his addiction problems. Detective Slater said the Defendant "never once said anything about him being willing to harm himself or hurt anybody else." He confirmed that the Defendant was not handcuffed during the interview despite not being free to leave. Detective Slater obtained an arrest warrant for the Defendant after the interview.

Following the first hearing, the trial court engaged in extensive oral findings of fact and conclusions of law in denying the motion to suppress. The court determined (1) Mother's statement that she observed the Defendant force the victim to engage in fellatio established probable cause for law enforcement officers to arrest the Defendant, (2) Tennessee Code Annotated section 33-6-401 provided law enforcement with discretion to take an individual to a mental health facility upon clear evidence the individual was suffering from a mental health episode, which was not established in this case; and (3) the Defendant was properly advised of his Miranda rights before his confession.

The Defendant then requested a continuance to file a Rule 9 interlocutory appeal of the trial court's denial of his motion to suppress, which was later withdrawn and replaced with his second motion to suppress. Upon review, the trial court was not inclined to consider the second motion to suppress because it raised "all the same issues raised in the original motion to suppress . . . . the same basis of the stop; basis of interaction with the Defendant." However, due to the severity of the offense, the trial court allowed the Defendant another hearing on the second motion to suppress.

At the second motion to suppress hearing, defense counsel again argued that law enforcement did not have probable cause to arrest the Defendant based solely on the statement of Mother; therefore, his confession should be suppressed as "fruit of the poisonous tree." In denying the second motion to suppress, the trial court renewed its findings of fact from the first hearing and provided additional legal authority supporting its conclusion. The trial court also noted that defense counsel raised an issue about Detective Slater making promises to the Defendant, which the court did not explicitly address in the first hearing. The court stated there was no merit to the Defendant's claim that Detective Slater "induced [the Defendant's] admissions" based on Detective Slater's comment that he would not judge the Defendant.

In pretrial discussions, the State advised the trial court that it did not anticipate the victim would testify. Because Mother did not witness the two earlier instances of sexual abuse and there was no independent evidence other than the Defendant's statement, defense counsel expressed her concern that the confession would be admitted without the corroboration required under State v. Bishop, 431 S.W.3d 22 (Tenn. 2014). After discussing the applicable law, the State advised the court that it did not intend to discuss the two other instances until it had a hearing concerning whether it had established sufficient corroboration of the Defendant's confession.

**Trial.**  At trial, the Defendant objected to the admission of Mother's 911 calls, arguing that Mother made a legal conclusion when she said the Defendant "was raping" the victim.  The trial court overruled the objection and admitted the recordings into evidence.  ACSO Dispatcher Foust testified consistently with the testimony from the motion to suppress about the special procedures for 911 calls involving child sex abuse cases.  Dispatcher Foust followed the protocol for child sex abuse calls in this case, which required notification of an officer and supervisor simultaneously.

Mother testified that before the Defendant's arrest, she had been romantically involved with the Defendant for twelve years.  Although they were never legally married, they called each other husband and wife and had three children together—the victim and two sons, who were 11, 13, and 10 years old, respectively, at the time of trial.  Mother identified the Defendant in the courtroom, confirmed he was their children's father, and testified that she and the children moved to Ohio "for [their] own safety" after his arrest.  She and the Defendant were no longer in a relationship and had not spoken to each other outside of court since his arrest.

Mother testified that she, the Defendant, and the children had been living in Bloomfield Trailer Park for about a year before his arrest.  At the time, she and the Defendant had a "pretty good" relationship and were making "decent money" after "struggl[ing] for a long time."  She had been recently promoted to manager at a fast-food fried chicken restaurant, and the Defendant was also employed.  Rather than send the children to daycare or hire babysitters, Mother and Defendant arranged their work schedules so one of them was always home with the children, and the Defendant was home alone with the victim "[m]ultiple times a week[.]"  Mother testified to behavioral changes the victim exhibited in the weeks leading up to the Defendant's arrest.  Mother testified that the victim usually asked for help washing her hair in the shower but stopped around her eighth birthday, which was six weeks before the Defendant's arrest.  Mother initially thought it was a sign the victim was getting older.

Mother testified she got off work early the day the Defendant was arrested.  Her cell phone charger was not working properly, and her phone was "completely dead" by the end of the workday, so she did not tell the Defendant she was leaving work early.  No one was in the living room when she arrived home.  Although she and the Defendant did not smoke cigarettes indoors, Mother smelled smoke in the house.  While looking for the Defendant, Mother noticed their bedroom door was closed, which was "weird" since they rarely closed that door.  Mother opened the door to find the Defendant "completely naked on the bed."  The victim was "on top of [the Defendant] . . . with his penis in her mouth."  The victim was wearing a T-shirt but no pants, underwear, or shoes.  The bedroom door was in the corner of the room, "so you [can] see directly across the bed.  You—you see everything."

- 7 -

After opening the door, Mother screamed, and the Defendant "grabbed [the victim] with his legs and flung her . . . off the bed and she hit the wall." The Defendant stood up, "looked at [Mother,] and [said,] 'What? . . . [meaning] 'What's the problem here?'" Mother "grabbed [the victim] and . . . ran to the bathroom." Mother testified that her "first instinct" was to get help, but her cell phone was dead, so she left the bathroom to get her charger. She saw the Defendant and told him to "[g]et away from us." She then ran to the kitchen to charge her phone. She called 911, but her phone died midway through the call. As her phone was charging, "[t]he Defendant ran out the front door."

Mother called 911 again and "explained . . . what [she] walked in on." The dispatcher told Mother, "[T]hey were going to send somebody out." Mother grabbed some of the victim's clothes and helped the victim get dressed. Mother testified the victim "looked scared" and appeared as if "she didn't want to be alone." Mother and the victim went outside to "wait on the front porch . . . for a while," but eventually, the victim "went back inside." Mother testified that the police arrived about 15 to 20 minutes later. Once the police arrived, Mother gave a statement. On the officer's recommendation, Mother took the victim to ETCH for an evaluation. Mother told ETCH doctors that she saw the Defendant's penis in the half-dressed victim's mouth. The victim had to undress and put on a hospital gown before her mouth and her vagina were swabbed, which caused the victim to cry. Nurses helped the victim stand during the evaluation, which included a rectal examination and a blood draw. Mother testified that she "tried to comfort [the victim], but she was so scared." Mother said there was no "doubt in [her] mind" what she witnessed.

On cross-examination, Mother testified she could not recall when she got to work the day of the incident but that the restaurant had opened at 10:00 a.m. Mother also could not recall when she got home but testified it was still light outside. Mother described the home layout and said the bedroom she shared with the Defendant was to the left of the main living room. The house had an open floor plan and no walls in the main living area. Mother testified that she could hear her sons "playing video games on the back side of the house" when she got home that day.

Mother confirmed that when she saw the victim on top of the Defendant, the victim was wearing a T-shirt but no pants. Mother had a "full view over the bed" with no obstructions when she entered the room. Mother confirmed she grabbed the victim and ran to the bathroom. After realizing her phone needed to be charged, Mother left the bathroom and saw the Defendant getting dressed. Mother told the Defendant to "[g]et away from us" as she went to the kitchen because she "didn't want him looking at [the victim] or [herself]." Mother testified the Defendant "ran out the front door" as she made her first 911 call. Mother also testified that she told the 911 dispatcher that the Defendant could not have driven very far because his car was low on gas. Mother could not remember if the Defendant called her after he left, but she testified that he sent her text messages.

Mother also testified that she found pants for the victim on the bathroom floor and that the victim did not shower or brush her teeth before going to ETCH. The sheets from the bed the victim and the Defendant were on were collected and not washed.

When the police arrived at their home, the Defendant had fled. Mother could not recall when the Defendant's brother and his family arrived at her home, or the exact time she and the victim returned home from the hospital. Mother knew that it was dark out. Mother could not remember whether the Defendant's brother's family waited in the driveway for thirty minutes until police told them they could exit their vehicles. Mother also could not remember calling the Defendant's brother, who had returned the Defendant's pickup truck to the house. Mother could not recall if the visit was pre-planned but testified that the Defendant's brother would often visit for family events.

Mother confirmed she and the Defendant never put their children in daycare and enrolled them in Head Start and preschool. She also confirmed that she and the Defendant would "swap schedules" so one could always watch the children. The Defendant's brother occasionally picked up the children from school but rarely watched them, and Mother testified that she and the Defendant never relied on outside help with the children. Mother testified she was a stay-at-home mom until the fast-food restaurant hired her, and it was normal for either her or the Defendant to be alone with the victim several times a week. Mother confirmed that her church owned a bus that would transport members' children to various weekly activities. The victim rode the church bus the morning of the offense and was gone for at least an hour, but Mother could not recall when the victim returned home. Mother confirmed she and the Defendant moved to Bloomfield Trailer Park "about a year" before his arrest. Before then, they lived with the Defendant's mother. Mother also testified she and the Defendant lived with a woman named Chesley Disney for about three years and shared a bed. However, Disney never watched Mother and the Defendant's children alone. Mother clarified she and the Defendant no longer lived with Disney during the events of this case, but the Defendant was still in contact with Disney. For about a year after the Defendant's arrest, Mother and the children lived with the Defendant's brother. Dr. Frances Craig, an emergency medical physician at ETCH, testified as an expert in emergency medicine and pediatrics. Dr. Craig conducted the victim's forensic medical examination. Dr. Craig explained that a "rape kit" is a box that contains "all the appropriate swabs and equipment" needed to collect DNA evidence. Once the evidence is collected, it is put back in the box, sealed with tamper-proof evidence tape, and held by the physician who conducted the exam or a nurse until it is given to hospital security, who keeps it in a secure location until law enforcement can send it to a lab for analysis. Dr. Craig testified the victim's exam was "for the most part . . . normal" but showed signs of perivaginal and periurethral irritation, which can be innocuous or a sign of abuse. Dr. Craig explained a normal exam result does not rule out abuse because child sexual abuse does not always produce physical evidence. On cross-examination, Dr. Craig confirmed that perivaginal

and periurethral irritation could have multiple causes unrelated to sexual abuse. Although Dr. Craig could not remember to whom she gave the victim's swabs at the end of the exam, she confirmed the swabs were given to hospital security.

ACSO Corporal James Presson, a patrol unit deputy and field training officer on the night of the Defendant's arrest, testified that he was dispatched to the Defendant's residence in response to the 911 call by Mother. The Defendant had already fled when Presson arrived, and Mother, the victim, and a person whose identity Presson could not remember were present. Corporal Presson spoke with an "emotionally distraught" Mother, who displayed "raw emotion . . . from crying to in shock to angry." Based on his observations, Corporal Presson "realize[d] something serious had happened." Corporal Presson issued a "be on the lookout" call ("BOLO") to other officers for the Defendant. After Mother gave her written statement, Corporal Presson and another deputy collected "a sheet and a hoodie" from the bedroom, which were transported to an evidence locker at the station.

On cross-examination, Corporal Presson could not remember if he and his deputy trainee were the first to arrive on the scene. He could not recall when he contacted Detective Slater, nor could he recall if anyone else responded to the Defendant's house because "it was a . . . hectic scene." Corporal Presson confirmed he issued the BOLO that led to the Defendant's detention. Corporal Presson also confirmed he did not know who owned the hoodie he collected from the scene or if it was sent for testing. Corporal Presson was not equipped with a body camera that night and could not remember if any of his interactions were recorded. He was not present when the Defendant was detained, but he spoke with him at the station.

Deputy Sheriff Mark Whaley's trial testimony was consistent with his testimony from the first suppression hearing. He testified that ACSO divided Anderson County into four numbered zones, and officers were assigned daily. The Defendant's BOLO originated from Zone 3. Although Deputy Whaley was assigned to Zone 1, he knew he needed to be involved "due to the seriousness of the call." Deputy Whaley explained it was ACSO policy to detain and handcuff anyone transported in a patrol car. Deputy Whaley was alone with the Defendant for five to eight minutes, or how long it took to transport the Defendant to the station.

On cross-examination, Deputy Whaley confirmed the Defendant's BOLO advised that a witness observed the Defendant abusing his daughter and that he was driving toward his employer in a blue pickup truck. After receiving the BOLO, Deputy Whaley did not go to the Defendant's home or speak with anyone before locating the Defendant. Deputy Whaley testified that the Defendant was not parked illegally when he found his truck. Although Deputy Whaley could not remember if the Defendant smelled of alcohol or if the

BOLO said anything about the Defendant being intoxicated, Deputy Whaley did not observe the Defendant to be intoxicated. Deputy Whaley explained that ACSO officers may detain individuals until their identity is confirmed if they match a description given in a BOLO. On redirect, Deputy Whaley explained that specially trained investigators, not patrol officers, usually interview child sex abuse suspects. On re-cross examination, Deputy Whaley testified he did not communicate with Detective Slater before transporting the Defendant to his office. Deputy Whaley also insisted that he detained the Defendant, but he characterized the pat down he administered as a search incident to arrest.

Detective Slater provided testimony at trial consistent with his testimony from the first suppression hearing. Upon learning that the Defendant had fled his home, Detective Slater requested a responding officer to issue a BOLO and to contact the Department of Children's Services to arrange an interview of Mother and the victim at ETCH. Detective Slater said the victim's rape kit was sent to the Tennessee Bureau of Investigation (TBI) for analysis; however, the tests for the Defendant's DNA, semen, and sperm were negative. Detective Slater testified that he never used intimidation or possessed a weapon during interrogations. Instead, he attempted to build rapport with suspects by asking questions unrelated to their case "just to kind of break the ice[.]" He wanted suspects to "feel comfortable talking about" child sex abuse, and he attempted to "normalize" the subject by being "empathetic with the things that they're saying." Detective Slater utilized these tactics in interviewing the Defendant. He authenticated the recording of the Defendant's confession by identifying the Defendant in the courtroom as the person whose voice is heard on the recording. The trial court entered the recording and the Defendant's signed Miranda waiver form into evidence over the Defendant's objection. The recording was then played for the jury.

On cross-examination, Detective Slater affirmed that the Defendant was detained based on Mother's allegations alone and that there was no physical evidence at the time. He agreed that Mother had never been a criminal informant and that the victim had not confirmed the allegations of abuse. He also never spoke with the victim and explained the Child Advocacy Center interviews minor victims of sexual assault. Detective Slater opined that he did not need to talk to Mother before interviewing the Defendant because she had already provided a written statement. He talked to Mother the following day. He also did not speak with ETCH until after interviewing the Defendant. Detective Slater testified that he did not believe "forcibly handcuffing somebody, placing them in a vehicle, [and] driving . . . them to the station" constituted excessive force.

Detective Slater could not remember when he became aware of the concern that the Defendant was suicidal or intoxicated. However, Detective Slater testified that the Defendant did not appear intoxicated to him, nor was he aware of anything in the BOLO saying the Defendant was intoxicated. Although Detective Slater was the only person in

the interview room with the Defendant, an armed officer was standing outside the unlocked door. The video recorder in the room was not working at the time. Defense counsel asked Detective Slater if he told the Defendant, "I promise to help you with all the . . . And I have a little bit of influence right now." Although Detective Slater responded in the affirmative, the recording reflects Detective Slater's actual words: "I want to try and help you as much as I can . . . I have a little bit of influence right now, but once it goes on, it's not gonna [sic] be worth a shot in the dark." Detective Slater explained the "influence" he was referring to was not influence over the legal system, but an "enormous amount of resources [he had] access to."

In a discussion concerning the State's election of offenses, the State explained that count one (rape of a child) and count two (incest) were based on the December 15, 2019 incident that Mother witnessed. For count three (rape of a child) and count four (incest), the State elected to rely on the first incident the Defendant referred to in his confession, which occurred approximately a month and a half before the December 15 incident and involved oral sex. For count five (rape of a child) and count six (incest), the State elected to rely on the second incident referred to in the Defendant's confession, which involved anal contact. Because it was unclear what the Defendant meant by "anal" in his confession, the trial court indicated its intent to reduce count five to aggravated sexual battery because there was insufficient evidence of penetration as well as to dismiss count six.

Following the close of the State's proof, the Defendant moved for a judgment of acquittal. The Defendant argued his confession did not contain sufficient detail to tie him to any specific offense. The Defendant also claimed the only other evidence against him, Mother's testimony, was insufficient to sustain a conviction beyond a reasonable doubt. The State argued a reasonable jury could convict the Defendant based on his confession, Mother's eyewitness account of the December 15 incident, and her testimony describing the changes she observed in the victim's personality. The State also argued there was sufficient evidence that the Defendant's confession was trustworthy even if every single fact contained within it had not been fully corroborated.

The trial court determined that Mother's testimony and the Defendant's confession were sufficient to present the December 15, 2019 rape and incest (counts one and two) to the jury. The trial court also found the Defendant's confession contained sufficient detail to present the November 1, 2019 rape and incest (counts three and four) to the jury. The trial court stated count five was a "much closer call" because there was no "proof of any specific date" for that offense, and it was not clear whether the "anal activity" the Defendant confessed to involved penetration or just touching. However, the trial court found that "the combination of the strong evidence for [c]ounts one and two, and the Defendant's admission with respect to the anal contact" were sufficient to present count five to the jury as aggravated sexual battery because there was no proof of penetration and

- 12 -

dismissed count six for the same reason. The court then denied the Defendant's motion for judgment of acquittal.

The Defendant called his son, the victim's older half-brother (hereinafter "Brother"), to testify on his behalf. Brother testified he lived with the Defendant, Mother, and the other children until the weekend before the Defendant's arrest. Brother testified he never saw the Defendant "go off alone" with the victim and that he moved out because he "could not stand" Mother. Brother testified he and the Defendant played World of Warships together the day of the Defendant's arrest. World of Warships is a video game for PlayStation 4 that allows users to play against each other via the internet. Brother testified he remembered the date he and the Defendant played World of Warships because he rarely got "to play games with [his] dad" and because he was "told what was happening" with the Defendant's case after being checked out of school early the following day. Brother testified he and the Defendant spoke to each other using the game's voice-over-internet protocol feature, which allowed players to talk to each other using a microphone-equipped headset. At some point, the Defendant abruptly logged off, his "character disappeared from the screen," and the game's "party chat" feature indicated he "left the party." On cross-examination, Brother testified he was at his biological mother's house that day, not the Defendant's. Brother also testified he was not aware the Defendant had confessed to engaging in sexual activity with the victim. After Brother testified, the Defendant rested his case.

The jury subsequently found the Defendant guilty on all five counts.

**Sentencing.** The trial court held a sentencing hearing on June 2, 2023. Mother testified and repeated much of the same testimony she provided at trial regarding her history with the Defendant. Additionally, she said the victim was eleven years old and had just finished fifth grade. The Defendant's arrest caused the family to lose half its income and forced them to go back on food stamps temporarily. Before the Defendant's arrest, Mother believed that the Defendant was "the safest person . . . to leave [her children] with" because he was their father. Mother testified that "[her] trust, [her] world just . . . broke" due to the Defendant's actions. Mother testified she "couldn't fathom that any parent would ever do that to their own child," and she "never thought [she'd] have to protect [her] own child from [the Defendant]." Mother said the Defendant's actions harmed her and the victim's ability to trust her new husband.

Mother testified the victim was "the happiest kid" before the events of this case and described her early childhood in idyllic terms. The victim had been a "straight-A student," and her teachers said she was "a joy to have in class." The victim "used to be very interactive" at home and school and volunteered frequently. However, the victim had since become a "shy [C-average] student." After the Defendant's arrest, the victim no longer

- 13 -

wanted to live in Eastern Tennessee, and the family relocated to Central Ohio. Mother testified the victim "started having anxiety and panic attacks at school" and would have "at least 12 breakdowns a year." The victim had panic attacks at the mention of traveling back to Eastern Tennessee. When Mother told the victim she was traveling to Eastern Tennessee to testify at trial, the victim broke down and cried for over an hour. For this reason, Mother did not tell the victim she was traveling to Eastern Tennessee again to testify at the hearing. Mother said the victim had seen several therapists since the Defendant's arrest and was currently seeing two therapists.

Mother testified that the victim initially did not understand what happened to her, but her understanding became more apparent with time. Mother opined the victim was poised to have a difficult adolescence as she "realizes the situation that she was put in[.]" Mother testified the victim told her the Defendant's actions made her scared and left her unsure "how to feel about things." The victim "worried about other people around [the Defendant]" because of a belief that he will "take [any] opportunity he's presented with" to act on his sex addiction.

On cross-examination, Mother testified one of the victim's therapists told her separating a child from family can be traumatic. Mother was unaware that the Defendant continued to date Disney after they moved to Bloomfield Trailer Park. Mother did not know how much alcohol the Defendant drank in a day, but she believed "[i]t was enough to be a problem." Mother never considered leaving Eastern Tennessee until the Defendant's children from his previous relationship were old enough to live independently. Mother confirmed she stayed in Eastern Tennessee with her children for about a year after the Defendant's arrest before moving to Central Ohio, where she has a sister and "a couple of cousins" who live about three-and-a-half hours away from her. Mother was on food stamps for a time after the Defendant's arrest, but she had not received any aid for the last two years. Mother testified her two sons did not know what the Defendant had done to the victim, but had been told the Defendant "was [not] going to be there anymore."

Mother confirmed that the victim had not begun puberty at the time of the offense. The victim had since reached puberty, and Mother agreed puberty "comes with a lot of hormones . . . [a]nd shifts in behavior." Mother also confirmed that the victim had received A's and B's in the second and third grades before the Defendant's arrest. Mother testified that she started dating her current husband around June 2020 and that he was only allowed to care for the victim alone after they had been dating for a year and a half. Mother was not aware of any statements the victim had made to the forensic psychologist who interviewed her after the offense.

The Defendant testified and denied the offenses in this case. Although he agreed that he provided a confession to law enforcement, he suggested the confession was coerced

because he was averse to conflict and always willing to comply with authority in stressful situations. He also suggested Mother fabricated her testimony because she was angry with him for drinking alcohol on the night of the offense and because she wanted to leave Tennessee without going through the legal process to obtain custody of their children. The Defendant claimed that the victim rode the bus to church on the morning of his arrest. He gave Mother his bank card that day so she could use her employee discount to buy lunch for the children on the church bus. The victim returned home "a little after noon," and he "counted up all [his] change" and went to buy a beer. The Defendant testified that he may have been playing the video game World of Warships when Mother came home that night, but he could not remember. If he was playing video games, it was with one of his sons from a previous relationship. The Defendant testified that Mother was upset with him when she arrived home that night, so he left the house and drove to the boat dock to cool off.

The Defendant testified Mother was from Northern Ohio and, before his arrest, discussed moving to Texas to be closer to her brother. The Defendant testified he had no interest in moving because he had always lived in Tennessee. The Defendant testified he and Mother had an open relationship and lived with Disney, their shared girlfriend, before moving to Bloomfield Trailer Park. According to the Defendant, he and Disney worked while Mother cared for the children. Mother broke up with Disney around the time they moved. However, the Defendant continued to see Disney, much to Mother's chagrin. The Defendant admitted he was an alcoholic and, before his arrest, would drink "12 to 18 [beers] a day before [passing] out and [going] to sleep." He testified that he "had just started going to [AA] meetings" before his arrest but was still drinking at that time. He advised the court that he had no criminal record and asked for mercy.

The Defendant argued mitigating factor (1) applied to his sentence because there was no proof his actions caused serious bodily injury. See Tenn. Code Ann. § 40-35-113(1) ("[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury"). The Defendant also argued that the evidence at trial was insufficient to support his conviction and, therefore, he should only receive the minimum sentence of twenty-five years. He also claimed he was in his mid-50s and argued that the minimum sentence was an effective life sentence. Based on his attendance at AA meetings, the Defendant asserted he was amenable to rehabilitation.

The State argued that the victim was "particularly vulnerable because of age" because the Defendant was one of only two adults who regularly cared for the victim. The State noted the Defendant admitted in his confession that he was a sex addict and that his actions were born out of his proximity and access to the victim. See Tenn. Code Ann. § 40-35-114(4) ("[the] victim of the offense was particularly vulnerable because of age or physical or mental disability"). The State argued that the Defendant used his "sole and

- 15 -

exclusive access" to the victim to gratify his sexual desires. Id. at § 40-35-114(7) ("[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement"). The State also argued that the Defendant abused a position of public and private trust to abuse the victim, citing the importance of family to society, the Defendant's position as the victim's father, and the fact that the assaults occurred at the victim's home while she was in the Defendant's care. Id. at § 40-35-114(14) (the abuse of "a position of public or private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense"). The State argued that the heinousness of the Defendant's crimes warranted a "long sentence and a long period of confinement." The State asserted that the Defendant lied in his testimony, demonstrating that he was incapable of rehabilitation. The State also argued that the Defendant should receive consecutive sentences because the Defendant engaged in repeated sexual abuse of his eight-year-old daughter.

Before imposing the sentence, the trial court noted that it had reviewed the State's sentencing memorandum of law and the Defendant's oral request to mitigate his sentence based on the absence of serious bodily injury. The court also reviewed the presentence report, which was admitted as an exhibit to the hearing. Finally, the court reviewed the Administrative Office of Court's (AOC) sentencing practices. The court acknowledged that the Defendant would normally be sentenced as a Range I standard offender; however, because he was convicted of rape of a child in counts one and three, a Class A felony, the law required that he be sentenced as a Range II offender, see Tenn. Code Ann. § 39-13-522(b)(2)(A) (2018) (since amended), with an applicable sentencing range between twenty-five and forty years, Tenn. Code. Ann. § 40-35-112(b)(1) (2019). The court acknowledged the Defendant was a Range I standard offender for the remaining counts, which meant the Defendant was subject to a sentence of eight to twelve years for aggravated sexual battery, a Class B felony, and three to six years for incest, a Class C felony. The court expressly noted the purpose and principles of the Sentencing Act and observed that the rape of a child and aggravated sexual battery convictions are required by statute to be served in confinement.

The trial court determined that the Defendant did not have a lengthy criminal history based on his prior public intoxication conviction and a pending DUI charge. The court also found that confinement was necessary "to avoid depreciating the seriousness of the offense" because "short of a murder, it's hard to imagine anything more egregious than a rape of a child." See Tenn. Code Ann. § 40-35-103(1)(B) (sentences of confinement are justified if "necessary to avoid depreciating the seriousness of the offense[.]"). The court found the Defendant's conduct troubling, "not only by its own nature but by the fact that it happened three times to the same victim," and because "it was a just a crime of opportunity for the Defendant," not attraction. The court also found that confinement would provide both specific and general deterrence, as incarceration was "the best means available to the

State to prevent ongoing serious criminal conduct such as incestuous crimes against children" and would prevent the Defendant from reoffending. See id. ("[C]onfinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses[.]"). The court also found that alternatives to confinement were only available on counts two and four by statute.

The trial court determined that no mitigating factors applied to the Defendant. Based on State v. Huddleston, the court found that the Defendant's sentence should not be mitigated despite the lack of proof of serious physical injury because "every rape is physically and mentally injurious to the victim," and "it is difficult to conceive of any factual situation where the rape of a child would not threaten serious bodily injury." No. 02C01-9706-CC-00228, 1998 WL 67684, at *3 (Tenn. Crim. App. Feb. 20, 1998) (citing State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996)) (emphasis in original). The court noted the State conceded that count five, aggravated sexual battery, could not be enhanced due to the victim's age and vulnerability, see Tenn. Code Ann. § 40-35-114(4), and declined to apply enhancement factor (4) to counts one and three for the same reason. However, because the crime of incest does not have an age component, the court applied enhancement factor (4) to counts two and four due to the victim's age and vulnerability. The trial court determined that enhancement factor (7), a defendant's desire for sexual gratification, did not apply to count five, aggravated sexual battery, because sexual gratification is an element of the offense. See Tenn. Code Ann. § 40-35-114(7). However, the court applied enhancement factor (7) to the Defendant's convictions for incest and rape of a child, counts one through four, reasoning rape and incest often result from a desire to dominate others, not sexual gratification. The court applied enhancement factor (14), abuse of a position of public or private trust, to all of the Defendant's convictions, reasoning that the Defendant was the victim's biological father and "in the most important position of responsibility for the care and well-being of [the victim] as any person could be save the mother." Id. § 40-35-114(14).

Regarding the AOC statistics, the trial court noted as follows:

> Now we move on to the statistical information from the AOC report. For rape of a child, the average or mean incarceration in length of months for a Range I offender – even though it's punishable at a Range 2, the stats mention Range 1 the average or mean is 295.86 months, which calculates out to 24.66 years.

> For "incest," they're — they don't — the AOC doesn't specifically track "incest" as its own charge. So looking to all C-felonies generally, the average or mean incarceration in months is 54.71 months, which calculates out to 4.56 years.

- 17 -

And for "aggravated sexual battery" as a standard offender, the average or mean incarceration in months is 117.24 months which calculates out to 9.77 years. Those are the statistics from across the state provided by the AOC.

The trial court found the Defendant's testimony was not credible because he "continue[d] to maintain that he was simply playing video games with his sons even in the face of his own admissions," and "he didn't just admit to [one] incident, he admitted to a course of conduct over a period of time that led to these additional charges." The court observed the aggravating circumstances in this case, including the Defendant's status as the victim's father, the time span of undetected sexual activity, the nature and scope of the sexual act, and the residual physical and mental damage to the minor victim. See Tenn. Code Ann. 40-35-115(b)(5) (the court may order consecutive sentences upon finding that the defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims). Upon consideration of the above factors, the trial court ordered a consecutive term of imprisonment of forty years for each rape of a child conviction, twelve years for the aggravated sexual battery conviction, and six years for each conviction of incest, for an effective sentence of 104 years in confinement.

The Defendant subsequently filed an unsuccessful motion for a new trial. He filed a timely notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

**I.**      **Motion to Suppress.** The Defendant argues the trial court erred in denying his motion to suppress because his statement was not voluntary. Although a section in the Defendant's brief is entitled "whether the trial court erred in denying his motion to suppress," the State argues, and we agree that the Defendant's specific basis in support of this issue is unclear. Other than the standard of review for "voluntariness of a statement" and a single citation to State v. McKinney, 699 S.W.3d 753, 766 (Tenn. 2023), the Defendant failed to provide any legal analysis or authority supporting this issue. See Tenn. R. App. P. 27(a)(7) (An appellant's brief must contain "[a]n argument . . . setting forth: (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]"). Of particular concern is the fact that the Defendant moved to suppress his statement on multiple grounds. These multiple grounds inhibit appellate review because, in the limited argument provided

- 18 -

in the Defendant's brief, he conflates arguments about how the trial court erred in denying the motion to suppress his statement. For example, he asserts in part that his statement was the "fruit of the poisonous tree" stemming from an alleged lack of probable cause. However, he also argues that his confession was coerced by the presence of an armed officer outside the interrogation room. He further asserts that his confession was involuntary based on the detective's alleged promise of leniency in treating him like a friend during his statement by calling him "dude" and "brother. More importantly, the Defendant did not file a reply brief once he was notified that the State was advancing waiver of this claim. Finally, in the oral argument in this case, appellate counsel conceded that this issue was waived. Accordingly, under these circumstances, we conclude that this issue is waived. See Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

**II.    Sufficiency of the Evidence.**[2]   The Defendant challenges his convictions in counts three through five based on the common-law rule that a conviction based solely on a defendant's confession cannot stand unless the jury is presented with independent corroborating evidence. See State v. Clark, 452 S.W.3d 268, 279 (Tenn. 2014) (citing State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000)). The Defendant argues the State failed to introduce sufficient evidence to corroborate his confession for counts three through five. The State contends that the Defendant's confession, combined with the corroborating evidence introduced at trial, constitutes overwhelming evidence of the Defendant's guilt on all five counts. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that

---

[2] The Defendant also raises the following three issues: whether the trial court erred in submitting his entire recorded confession to the jury, whether the trial court erred in denying the Defendant's motion for judgment of acquittal for counts three through five, and whether the trial court erred in affirming the Defendant's convictions in its role as the thirteenth juror. In support of each issue, he relies on the same argument and authority presented in support of Issue II. Accordingly, we reject these issues based on the same reasoning in this section of our opinion.

- 19 -

evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)).

In Bishop, the Tennessee Supreme Court adopted the modified trustworthiness standard for evaluating whether an extrajudicial statement is sufficiently corroborated. 431 S.W.3d at 58; State v. Willis, 496 S.W.3d 653, 750 (Tenn. 2016). Under this standard, a defendant's extrajudicial confession is sufficient to support a conviction if the State presents "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury." Bishop, 431 S.W.3d at 58 (internal citations and quotations omitted). A trial court's determination that an extrajudicial confession is sufficiently corroborated is a legal conclusion, which we review de novo. However, to the extent that an accused's challenge to the determination of the trial court rests on disputed facts, we will defer to the findings of the trial court unless the record preponderates against them.

The corroboration requirement is a low threshold. Clark, 452 S.W.3d at 280. Its purpose is twofold: to weed out false confessions to nonexistent crimes (by requiring some independent evidence that the injury occurred) and to weed out false confessions to actual crimes (by requiring some independent evidence that implicates the accused). Id. (citing Bishop, 431 S.W.3d at 59-60). The standard of proof required to clear this hurdle is even lower than the "preponderance of the evidence" standard. Id. (citing Bishop, 431 S.W.3d at 59 n.33 (quoting Smith v. United States, 348 U.S. 147, 156 (1954))). As explained in Bishop:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the

answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

431 S.W.3d at 58-59 (footnotes and citations omitted). "Prima facie" evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Clark, 452 S.W.3d at 280 (quoting Black's Law Dictionary 638-39 (9th ed. 2009)). "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." Id. (quoting Black's Law Dictionary 640 (9th ed. 2009)).

To establish trustworthiness, independent evidence must corroborate essential facts included in the defendant's statement. Bishop, 431 S.W.3d at 59. The independent corroborating evidence need not establish by itself the offense beyond a reasonable doubt or by a preponderance of the evidence. Id. at 59 n.33. Additionally, "[t]here is no need to corroborate every element of the crime or every crime contained in the confession." Clark, 452 S.W.3d at 281 (citing Bishop, 431 S.W.3d at 59 n.33). In certain circumstances, "independent corroboration of one key part of an extrajudicial confession or admission may corroborate the entire statement." Bishop, 431 S.W.3d at 59. See also United States v. Brown, 617 F.3d 857, 863 (6th Cir. 2010) (concluding that the entirety of a defendant's extrajudicial confession had been corroborated in a felon in possession of a firearm case because the State corroborated one key fact in the confession—namely, that a necklace and gun and been stolen from the victim's home). However, independent evidence that only corroborates collateral circumstances surrounding the confession is insufficient to establish trustworthiness. Id. at 60.

The record shows that before the jury was permitted to hear the Defendant's recorded confession, the trial court conducted a hearing outside the jury's presence. The State argued that Mother's eyewitness testimony, including her description of the changes in the victim's behavior during the thirty days the Defendant specified in his confession, and Dr. Craig's findings during the forensic medical examination were more than sufficient corroboration. The State also argued Mother's testimony regarding the way she and the Defendant alternated their work schedules showed he had the opportunity to commit the charged offenses. In support of its argument, the State relied on State v. Ellis, which held that "independent evidence that the appellant engaged in various sexual acts with [his minor victim] during the time period charged in the indictment" corroborated a specific instance of sexual activity mentioned in the appellant's confession. 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000).

The Defendant argued that the modified trustworthiness standard outlined in Bishop was higher than the "any evidence, however slight" standard asserted by the State. While the Defendant conceded he had the opportunity to commit the charged offenses because of the amount of time he spent alone with the victim, he argued that opportunity alone was insufficient to corroborate his confession. The Defendant pointed to the fact that Mother also had time alone with the victim in support of his argument.

The trial court determined that the Defendant confessed to three offenses, the "main offense," which occurred the day he was arrested, and two offenses that occurred at some point in the previous thirty days. The court found "lots of corroboration for the main offense," including Mother's eyewitness testimony. Mother's eyewitness testimony, along with her testimony regarding changes in the victim's behavior and demeanor and the Defendant's access to the victim, were sufficient to corroborate the other two offenses. The court noted that the Defendant's access to the victim, on its own, would not be sufficient corroboration. However, given the "strong evidence" for the main offense and the temporal proximity between the main offense and the other offenses, the trial court determined that the Defendant's access to the victim was corroborative. The trial court detailed its findings the following day:

> So the Court found yesterday that there is, of course, an abundance of corroboration from the eyewitness as to the 12-15-2019 offense [counts one and two], [which was] the third offense in time, for the Jury to hear about that in the confession.
>
>  . . . .
>
> [B]ecause [Mother] testified that there was a change in [the victim's] behavior around her eighth birthday which was at the end of November, I think she said November 30th, that's right around, you know, 16 days or so, roughly, before [the offense Mother witnessed]. But that's the right sort of time frame where [the victim] suddenly becomes, according to [Mother], reluctant to let people see her bathe, became more, I guess, shy and reserved about that, started wanting to hide herself, I guess was the way [Mother] described it.
>
> And so the — the — the strength of the evidence as to [counts one and two] and [Mother's] testimony about the change in [the victim's] behavior and [Mother's] testimony about [the Defendant's] access . . . to [the victim], that they never relied on daycare and that one of the two parents stayed home all the time to take care of [the victim] so whenever [Mother]

was away at work it was the father, the Defendant, who was home taking care of [the victim], there's that access there.

Based upon that, I found that the modified trustworthiness standard was met as to the Defendant's statement for the other two earlier offenses sufficient to let the Jury hear [the entirety of the Defendant's confession].

Initially, we must determine whether this offense involves a tangible injury. During a hearing outside the jury's presence, the Defendant argued that the charged offenses involved a tangible injury because there was no physical evidence, and the victim did not testify. The Defendant's argument relied on a misreading of Bishop, which states that "[c]rimes that lack a tangible injury may include . . . sex offenses lacking physical evidence *and* a victim who can testify." Bishop, 431 S.W.3d at 59 n.28 (emphasis added). While there is some, albeit inconclusive, physical evidence in this case, the victim did not testify. As such, we will apply the standard for crimes that lack a tangible injury. Cf. State v. Frausto, 463 S.W.3d 469, 480 (Tenn. 2015) ("Because this is a sex offense lacking physical evidence but involving a victim who testified, we apply the standard for tangible injury crimes."). To satisfy the modified trustworthiness standard under these circumstances, the State was required to introduce substantial independent evidence that tended to show the Defendant's confession was trustworthy and link the Defendant to the crime. We conclude that the State met its burden.

In support of his argument that the State was required to introduce evidence corroborating each crime mentioned in his confession before it could be admitted to the jury, the Defendant relies on State v. Espinosa, No. M2013-02751-CCA-R3-CD, 2015 WL 1933309 (Tenn. Crim. App. Apr. 29, 2015). The defendant in Espinosa was charged with eighteen counts of aggravated rape of a child based on his confession to the rape of his two-and-one-half-year-old stepdaughter. 2015 WL 1933309, at *4-5. The victim's mother testified to her suspicion of the abuse based on finding her expensive lotion in the victim's room and upon observing the victim "rubbing her vagina" while taking a bath. The three-year-old victim testified, but could not identify the defendant in court. The victim's mother said the victim referred to the defendant as "Papi," and the victim testified that Papi had lived with her and her mother. The victim said Papi hurt her and pointed to her buttocks when asked where Papi hurt her. The victim said she told her mother that Papi hurt her. The victim identified an anatomical drawing of a female and pointed to the buttocks, indicating where Papi hurt her.

The victim did not know how many times Papi hurt her. She remembered Papi's hurting her and denied someone told her to say that Papi hurt her. In his August 1, 2012 interview with law enforcement, the defendant initially denied abusing the victim; however, he later confessed to sexually molesting the victim "for the last month or so." Id.

- 23 -

at *4. The defendant denied vaginal penetration of the victim but said he anally penetrated the victim with his penis. When asked how many times this occurred, the defendant equivocated and said, "maybe fifteen times in the last month." Id. He said he last attempted to penetrate the victim anally on August 1, the day of the interview, around 7 a.m. while his wife was at work. Id. The defendant denied oral sex between himself and the victim. He admitted that the victim had "touched him," but he denied having the victim "rub" him. Id. He admitted that he "rubbed" the victim's vagina, but he had not digitally penetrated the victim's vagina. Id. The defendant said that before they moved to Tennessee, he worked daily, and that other people were always around him and the victim. Id. He said the incidents began only one month before the August 1 interview. Id. at *5. When he was told he was being charged with a felony and asked again when the sexual contact first began, the defendant said it was before July 4, which indicated a period of time longer than one month. Id.

The defendant said that when he first arrived in Tennessee, he did not have a job for about two or more weeks, that they had not found a daycare, and that his wife found work first. Id. He said the incidents probably began in May after they moved to Tennessee. He thought the first incident occurred on May 25 and said it was not "[a] daily thing." Id. He said he could not tell the detective the number of incidents but said it was probably more than fifteen because the incidents occurred for more than the one month he originally stated. Id. When asked for his best "guess," he said about forty-five incidents. Id. Law enforcement used the information provided by the defendant and the defendant's and the victim's mother's work histories, to identify the dates on which the defendant "would have had at least the opportunity to molest" the victim. Id. They also used the dates on which the victim's mother worked, and the dates the defendant's employer reported he had not worked. Id. The defendant identified May 25 in his confession, and law enforcement identified May 28 and 29 as dates the defendant would have been alone with the victim because he did not work, and the victim's mother worked. Id. The remaining dates in the indictment, except August 1, were verified as dates when the victim's mother worked, and the defendant did not. Id. The defendant identified August 1 in his confession as the date of the last incident. Id. The defendant was subsequently convicted as charged of eighteen counts of aggravated rape of a child. Id.

On direct appeal, the defendant argued the evidence was insufficient to support his convictions of aggravated rape of a child because the proof only established that he attempted but never penetrated the victim's anus with his penis. Id. The defendant also argued the State failed to make a proper election of offenses for counts two through seventeen. Id. In analyzing the sufficiency of the evidence, this court rejected the defendant's claim that the proof did not support aggravated rape of a child because the defendant testified that he inserted the tip of his penis into the victim's anus. Id. at *10. This court conducted additional analysis of the sufficiency of the evidence for each

individual count of the indictment and concluded that the State had sufficiently corroborated the defendant's confession for count eighteen based on the defendant's time alone with the victim given his and the victim's mother's work schedule, the possibility of a midline anal fissure, mother noticing the victim was not wearing her pajama's on August 1, mother noticing her lotion in victim's room on August 1, and the victim's statements that the defendant hurt her, while pointing to her buttocks and identifying the same area on an anatomical drawing. Id. at *11-12. However, this court reversed and vacated the remaining counts one through seventeen based on the State's failure to corroborate the defendant's confession. Id. at *10, *15.

We question Espinosa's viability, as it contradicts State v. Clark, 452 S.W.3d at 281, a case in which our supreme court explicitly held that prosecutors need not corroborate each crime mentioned in a defendant's confession to satisfy the modified trustworthiness standard. See Bishop, 431 S.W.3d at 59 n.33. Indeed, the issue raised in Espinosa was not whether the evidence was sufficient to corroborate the defendant's confession, which is evident by the absence of any citation to Clark and the relevant case authority.[3] In any case, we find Espinosa factually distinguishable from the instant case. The Espinosa court was concerned with the defendant's confession because while the defendant generally admitted to penetrating the victim's anus fifteen to forty-five times between May and August 2012, he provided dates for only two counts: one and eighteen. His description of the incidents in his confession was general regarding sexual contact and no detail was provided by the defendant. In the instant case, the Defendant confessed to three specific acts of fellatio, cunnilingus, and anal contact with the victim within a month of his December 15 interview.

Moreover, as previously noted, the defendant in Clark, confessed to "as many as eleven acts of sexual molestation against his daughters." At trial, the daughters testified generally that the defendant-dad had touched their private parts but that they could not remember much about the incidents anymore. In affirming the defendant's convictions, our supreme court stated that the daughters' testimony alone was sufficient to clear the low threshold required by the modified trustworthiness standard. The daughters' testimony included "facts that establish the crime which corroborate facts contained in the confession," and is one type of evidence that satisfies the modified trustworthiness standard. Clark, 452 S.W.3d at 281 (internal citation and quotation omitted). Once the State presented evidence indicating that a key aspect of the defendant's confession was trustworthy, the jury was free to convict him of any criminal act contained in his confession.

---

[3] As potential explanation, the opinion in Clark was issued on November 10, 2014, and briefing in Espinosa was completed by November 12, 2014, and the opinion filed on April 29, 2015.

Based on Clark, Mother's testimony alone is sufficient to corroborate the entirety of the Defendant's confession under the low bar set by the modified trustworthiness standard. Mother was an eyewitness to the December 15 rape of a child and incest, and her testimony was consistent with the Defendant's confession to the other crimes that formed the basis for counts three through five. Accordingly, the State introduced sufficient evidence to corroborate the Defendant's confession under the modified trustworthiness standard. Based on the Defendant's confession, a rational trier of fact could have found the Defendant guilty beyond a reasonable doubt of counts three through five, and the Defendant is not entitled to relief.

**III.    Sentencing.** The Defendant essentially contends that the trial court imposed an excessive sentence. He does not challenge the trial court's application of the enhancement factors in this case, nor does he challenge the statutory grounds relied upon by the trial court to impose consecutive sentencing. Instead, the Defendant argues the trial court failed to apply mitigating factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury," to his sentence despite the lack of testimony or a statement from the victim regarding her emotional state. The State argues that the trial court properly exercised its discretion in imposing consecutive sentences at the top of the range for each offense, given the Defendant's position of trust as the victim's father, the fact that the crimes were committed to gratify the Defendant's sexual desire, the egregious nature of the crimes, and the Defendant's denial of responsibility. We agree with the State.

A trial court's sentencing decisions are reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). The same standard of review applies to consecutive sentencing. State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015) (citations omitted) (internal quotation marks omitted).

Trial courts are instructed to consider the following factors when sentencing a defendant:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). These factors suggest adjusting the defendant's sentence upon the presence or absence of mitigating and enhancement factors. Id. § 40-35-210(c). However, the 2005 amendments to the Act deleted as grounds for appeal a claim that the trial court did not weigh the enhancement and mitigating factors properly. See State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008). Additionally, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from [the Act]." Bise, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. The burden is on the defendant to show that the sentence imposed was improper.

The record reflects the trial court imposed a within-range sentence upon consideration of the purpose and principles of the Act, and the Defendant's effective 104-year sentence is therefore cloaked with a presumption of reasonableness. The Defendant conceded at the presentation of oral argument that the trial court considered mitigating factor (1), that his "criminal conduct neither caused nor threatened serious bodily injury[.]" Tenn. Code Ann. § 40-35-113(1). Although the Defendant was aggrieved that the trial court did not reduce his sentence based on this factor, he acknowledged this was no longer grounds for relief on appeal. In any case, the record reflects the trial court considered mitigating factor (1) and determined it did not apply based on Huddleston, 1998 WL 67684, at *3 (citing Kissinger, 922 S.W.2d at 487).

In Huddleston, the child rape victim testified at trial that the defendant hurt her when he digitally penetrated her vagina, she walked "gap-legged," and there was blood found in her panties after the offense. Id. at *1. The doctor who examined the victim testified that her hymen had been torn and that such a tear could occur from digital penetration of the vagina. Id. At sentencing, the trial court declined to apply mitigating factor one, and it imposed a presumptive twenty-year sentence. Id. In affirming the sentence, this court stated:

[E]very rape is physically and mentally injurious to the victim. It is difficult to conceive of any factual situation where the rape of a child would not *threaten* serious bodily injury. Notwithstanding this fact, serious bodily

- 27 -

injury as defined by the statute includes an injury that involves "extreme physical pain." The young victim testified that the appellant hurt her. The doctor at the emergency room testified that her hymen was torn and observed blood on her external genitalia. We have held that injuries similar to the victim's in this case constitute serious bodily injury for the purposes of the statute. Moreover, we have held that serious bodily injury also includes a mental element. Clearly, the fact that the victim was raped at age seven necessarily includes mental anguish and suffering.

Id. at *3 (emphasis in original) (internal citations omitted).

The Defendant claims that his sentence is excessive because the victim did not testify regarding her condition or emotional status, and there was no evidence his criminal conduct caused nor threatened serious bodily injury. This court has consistently upheld a trial court's rejection of mitigating factor (1) when a defendant has sexually abused minors. See State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994); Sanchez v. State, No. M2017-02253-CCA-R3-PC, 2019 WL 1399880, at *10 (Tenn. Crim. App. Mar. 27, 2019); State v. Thompson, Nos. M2003-00487-CCA-R3-CD & M2003-01824-CCA-R3-CD, 2004 WL 2964704, at *19-20 (Tenn. Crim. App. Dec. 20, 2004). Moreover, while the victim did not testify, Mother observed the changes in the victim's behavior since the Defendant's crimes against the victim and his subsequent arrest. As a result of the Defendant's criminal conduct, the victim "started having anxiety and panic attacks at school" and would have "at least 12 breakdowns a year." Upon being told about returning to Tennessee for court, the victim "just puddled" or cried profusely. Mother said the victim had seen several therapists since the Defendant's arrest and was currently seeing two therapists. Dr. Craig testified the victim's exam was "for the most part . . . normal" but showed signs of perivaginal and periurethral irritation, which can be innocuous or a sign of abuse. Dr. Craig explained a normal exam result does not rule out abuse because child sexual abuse does not always produce physical evidence. Based on the above proof, we conclude that the trial court did not abuse its discretion in rejecting mitigating factor (1) because the Defendant's conduct threatened serious bodily injury and necessarily included mental anguish and suffering of the eight-year-old victim.

In addition, in what appears to be an afterthought, the Defendant suggests his sentence is excessive in a single sentence, arguing the trial court "goes in the opposite direction of the Administrative Office of the Court's (AOC) sentencing guidelines and averages and sentences the Defendant to the maximum amount on each count." The record reflects the trial court's consideration of the statistical information from the AOC report. See Tenn. Code Ann. § 40-35-210(b)(6) (instructing a sentencing court to consider

statistical data generated by the AOC about sentencing practices for similar offenses in Tennessee).[4]

For counts one and three, the Defendant was convicted of rape of a child, a Class A felony. At the time of the Defendant's offenses, the law required that he be sentenced as a Range II offender, Tenn. Code Ann. § 39-13-522(b)(2)(A) (2018) (since amended), with an applicable sentencing range between twenty-five and forty years. Tenn. Code. Ann. § 40-35-112(b)(1) (2019). After applying two enhancement factors, the trial court imposed the maximum sentence of forty years or 480 months of confinement on each count. In observing the AOC statistics, the trial court referenced the average period of confinement for Range I standard offenders, or 295 months, because the chart did not reflect an offender's Range. Based on the standard offender status, a difference of 185 months exists. However, a review of the chart for all offenders convicted of rape of a child, which includes the category of multiple offenders, shows the average sentence is 359.26 months or 29.94 years.[5] This reflects a difference of 121 months or 10.08 years, with a standard deviation of 66.25 months. The trial court's sentence is less than two standard deviations from the mean, and the Defendant has not shown that a sentence in this range is an outlier. The court enhanced the Defendant's sentence based on two factors that are not challenged in this appeal. The court also considered the Defendant's continued denials or refusal to take responsibility for the offense and emphasized that the Defendant raped the victim over an extended period. These factors sufficiently account for the difference between the Defendant's forty-year sentence for rape of a child and the average twenty-nine-year sentence imposed for the same offense across Tennessee.

As a Range I standard offender for the remaining convictions, the Defendant was subject to a sentence of eight to twelve years for aggravated sexual battery, a Class B felony, and three to six years for incest, a Class C felony. The trial court imposed a sentence of twelve years or 144 months for the aggravated sexual battery and a sentence of six years or 72 months for each count of incest. The court applied one enhancement factor to the Defendant's aggravated sexual battery conviction and three enhancement factors to his convictions for incest. Once again, the Defendant does not challenge these enhancement factors on appeal. Because the report did not track the offense of incest, the court compared all Class C felonies for standard offenders, generally, which were sentenced on average to 54.71 months or 4.56 years, with a standard deviation of 18.07

---

[4] See Administrative Office of the Courts, Sentencing Practices in Tennessee: Information for Cases Sentenced Between July 1, 2014 and June 30, 2022, TENN. COURTS (March 2023), https://www.tncourts.gov/sites/default/files/docs/Criminal%20Sentencing%20Stats%20FY2022.pdf.

[5] The AOC report provides, "Sentence lengths are reported for standard offenders, multiple offenders and for all offender types as a group from the body of convicted felons in the State Criminal or Circuit Criminal Courts. Standard and multiple offender defendant types were chosen because they comprise over 90% of all sentences in Tennessee."

months.  Finally, the court noted the average sentence for a standard offender convicted of aggravated sexual battery was 117.24 months or 9.77 years, with a standard deviation of 20.02 months.  In light of the applicable enhancement factors, we conclude that the Defendant has not shown any unjustified disparity in light of the standard deviations calculated for each offense and the sentencing considerations weighed by the trial court.  Accordingly, the Defendant has failed to establish that the trial court abused its discretion in ordering him to serve an effective sentence of 104 years in confinement.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

s/ Camille R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE